**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: 2009-NMSC-029**

**Filing Date:  May 29, 2009**

**Docket No.  29,869**

**STATE OF NEW MEXICO**,

          **Plaintiff-Appellee,**

**v.**

**ORLANDO TORREZ,**

          **Defendant-Appellant.**

**APPEAL FROM THE DISTRICT COURT OF TAOS COUNTY**
**Peggy J. Nelson, District Judge**

Aarons Law Firm, P.C.
Stephen D. Aarons
Santa Fe, NM

for Appellant

Gary K. King, Attorney General
Max Shepherd, Assistant Attorney General
Santa Fe, NM

for Appellee

**OPINION**

**CHÁVEZ, Chief Justice.**

**{1}**     Defendant Orlando Torrez directly appeals his convictions of first degree murder, shooting at a dwelling or occupied building resulting in injury, and tampering with evidence; charges arising from the shooting death of Danica Concha at a Halloween party in 2003. Defendant raises four arguments on appeal:  (1) the trial court erred in not granting a mistrial after the jury expressed fears of gang retaliation; (2) the trial court erred in admitting the testimony of an expert witness on the subject of gang-related law enforcement and gang culture; (3) his convictions for felony murder and shooting at a dwelling house resulting in

1

injury violated his constitutional protection against double jeopardy; and (4) cumulative error. We hold that the trial court erred in admitting the testimony of the gang expert, vacate Defendant's convictions, and remand for a new trial.

## I. BACKGROUND

**{2}** On Halloween night in 2003, Defendant, his girlfriend, Samantha Sanchez, his friend, Alfredo Sanchez, and three others went to a house party near Taos, New Mexico. During the party, two unidentified men confronted Defendant and threatened to kill him and his family because Defendant had killed a young man named Jeremy a few years earlier.[1] Defendant and his companions left the house and the two unknown men, armed with guns, approached them as they walked toward Defendant's vehicle. The men again threatened the lives of Defendant and his family and instructed him and his friends to leave or they would be killed. Defendant and his companions got into his car, and while they were driving away, the two men fired gunshots at Defendant's vehicle, hitting it at least twice. No one was injured.

**{3}** Defendant and his companions returned to his house. Defendant testified that he was scared that the assailants would come by his house and shoot at them again because they had told him they knew where he lived. He stated that he wanted to go back to the party and confront the men rather than take the chance that they might come to his house and hurt his pregnant girlfriend or unborn child. Defendant armed himself with a 9 millimeter handgun, and he and Alfredo then gathered five of Defendant's firearms–a 12-gauge shotgun, a 16-gauge shotgun, a .22 caliber rifle, a .303 caliber rifle, and a .270 caliber rifle–and loaded them into Defendant's car. Defendant and Alfredo returned to the party in Defendant's car with the firearms.

**{4}** At trial, Defendant described the following events after he and Alfredo returned to the party. He parked the car near the edge of the property and, having noticed one of the two men who had threatened him earlier standing outside the house, Defendant approached the man. While talking to him, Defendant was hit on the head from behind, fell to the ground, and was kicked. He reached for the 9 millimeter handgun that he had stuffed in his waistband, but it was missing. After getting back on his feet, Defendant was running to his car when he heard gunshots fired from behind him. Alfredo testified that when he saw Defendant running back toward the car, Defendant was unarmed and there was gunfire coming from the house. However, Alfredo could not state with certainty that Defendant had not been the first to shoot.

---

[1]As a minor, Defendant apparently pled no contest to the involuntary manslaughter of Jeremy and spent two years in reform school. Although the facts supporting Defendant's prior homicide conviction were not before the jury and are not part of the record, Defendant and his grandmother both testified that they had lived in fear because of Defendant's involvement in Jeremy's death.

{5}     Once back at his car, Defendant testified that he grabbed the .303 caliber rifle and fired toward the house where he could see sparks of light that looked like gunfire. He stated that he heard more gunfire from a different area of the yard, grabbed the 12-gauge shotgun from his car, and then fired in the direction of those shots. Alfredo testified that he fired the 12-gauge shotgun, implying that Defendant did not. No one admitted to having fired the .270 caliber rifle, but casings from that gun were found at the scene.

{6}     At the time of the shooting, Naarah Holgate and Danica Concha were in a bathroom inside the house. Naarah testified that she heard what she thought were fireworks and then saw Danica collapse in the bathtub. An expert testified that Danica had been shot in the chest and killed with a bullet that was consistent with being fired from a center-fire, high velocity rifle. However, the expert could not say which weapon fired the fatal bullet.

{7}     The jury convicted Defendant of first degree murder, shooting at a dwelling resulting in injury, and tampering with evidence. Defendant raises four issues on appeal: (1) jury bias; (2) improper expert testimony; (3) double jeopardy; and (4) cumulative error. Because we grant Defendant's request for a new trial on the basis that the trial court erred in admitting the expert's testimony, we do not address Defendant's other claims of error. Any possible error associated with juror bias will be corrected when a new jury is empaneled at Defendant's new trial. Because we vacate his convictions, Defendant's constitutional protection against double jeopardy has not been impaired. Finally, we conclude that his cumulative error argument is without merit. Therefore, we address only the error associated with the admission of the expert's testimony.

## II.     DISCUSSION

{8}     At trial, the State called Detective Robert Martinez as an expert witness to testify about "gang-related law enforcement and gang culture." The trial court admitted his testimony over Defendant's objections. On appeal, Defendant raises four arguments, alleging that the trial court's admission of Detective Martinez's expert testimony was in error. First, he argues that Detective Martinez was not qualified to be an expert on the behaviors of Taos gang members. Second, he contends that the expert's testimony was the equivalent of "junk science," amounting to nothing more than a prediction of Defendant's behavior on the basis of his association with a gang. Third, Defendant argues that evidence of Defendant's association with gangs was impermissible propensity evidence that encouraged the jury to conclude that he acted in conformity with the actions of members of criminal street gangs. Finally, Defendant asserts that the expert's testimony was irrelevant and unfairly prejudicial because there was no evidence presented at trial that this shooting was gang-related. The State contends that Detective Martinez was qualified to give expert testimony on the subject of the behaviors of gang members and that the evidence of Defendant's affiliation with gangs was allowable to show Defendant's motive or intent, which the parties agree was the ultimate issue in this case. The State also argues that the expert's testimony was neither irrelevant nor unfairly prejudicial because "the record clearly establishes that gang membership and gang affiliation permeated this entire trial."

3

**{9}**     We review the trial court's admission of expert testimony for an abuse of discretion. *State v. Alberico*, 116 N.M. 156, 169, 861 P.2d 192, 205 (1993).  However, our role is not to simply "rubber stamp" the trial court's determination.  *Id.* at 170, 861 P.2d at 206.  The abuse of discretion standard "should not prevent an appellate court from conducting a meaningful analysis of the admission [of] scientific testimony to ensure that the trial judge's decision was in accordance with the Rules of Evidence and the evidence in the case." *Id.* We agree with the State that the trial court did not err in qualifying Detective Martinez as an expert on the subject of gang-related law enforcement and gang culture.  We also agree that the expert's testimony was not impermissible propensity evidence because it was offered to prove Defendant's motive.  However, we conclude that the danger that the expert's testimony was unfairly prejudicial to Defendant substantially outweighed its probative value. Therefore, we vacate Defendant's convictions and remand for a new trial.

## A.     THE PURPOSE OF THE EXPERT'S TESTIMONY

**{10}**     In *Alberico*, we stated that  "the proper initial inquiry for the admissibility of expert opinion testimony . . . is [to determine] the purpose for which it is being offered."  116 N.M. at 172, 861 P.2d at 208.  The purpose of the testimony guides our inquiry into whether the expert was qualified to give an opinion on the subject, as well as our determination of whether the testimony was relevant, probative, and not unfairly prejudicial.  Thus, we begin our inquiry by determining what the State sought to prove with Detective Martinez's testimony.

**{11}**     In our review of the record, we discern two distinct purposes of Detective Martinez's testimony:  (1) to prove that Defendant was a member of the Barrio Small Town (BST) criminal street gang and (2) to explain Defendant's motive for returning to the party and shooting at the house.  Prior to Detective Martinez's testimony, evidence had been introduced that Defendant had a tattoo that identified him as a BST member.  Detective Martinez corroborated this testimony when he testified that BST was a "homegrown" gang in Taos and that the letters "BST" identified BST gang members.  He emphasized that tattoos are prevalent in gang society and that tattoos of gang signs, symbols, and abbreviations are identifiers of who is a member of a particular gang.  Thus, Detective Martinez offered circumstantial evidence that Defendant was a member of BST.  However, no direct evidence was presented at trial that Defendant was a member of BST or any other gang at the time of the shooting.

**{12}**     The other, more significant purpose of Detective Martinez's testimony was to refute Defendant's claim of self-defense by offering another explanation of Defendant's motive for shooting at the house.  The expert's testimony was significant because Defendant's intent was the primary focus of the parties' dispute.  Defendant admitted that he shot at the house with a gun that could have fired the fatal bullet.  However, he asked the jury to find that he did so in self-defense, in response to being shot at first by unidentified assailants.  In contrast with Detective Martinez's testimony, the State asked the jury to conclude that Defendant, an alleged gang member, returned to the party that night seeking revenge or retribution for

4

being threatened, shot at, and otherwise disrespected.

**{13}** Detective Martinez testified that respect is the most important value in gang culture. He testified that gang members gain respect through fear, intimidation, violence, and by controlling the drug trafficking trade. He also stated that gang members are governed by "the code of the street" and are motivated by "retribution," "an eye for an eye," with "[n]o assault go[ing] unanswered." He stated that in his expert opinion, once a gang member has been disrespected, he or she must retaliate with "retribution that . . . is always done through violence."

**{14}** Detective Martinez explained that gang members can be disrespected in a number of ways. For example, showing a gang-specific tattoo in public or to members of another gang would be disrespectful, as would "mad-dogging," a form of confrontation where two individuals aggressively stare at one another. Spoken threats are another form of disrespect, as are threats to a person's life and the destruction of a person's property. Detective Martinez further explained that disrespecting a gang member in front of other people demands retribution, especially if the member is disrespected in front of members of his or her own gang. Additionally, Detective Martinez repeatedly referred to gangs as "criminal," explaining that

> if somebody is making threats to the well-being of another or to their life, some course of action must be taken [by] the person who is being threatened, not only because he must protect himself from becoming a victim from the perpetrator, but also because other people know about this. And if you don't go out and take care of business, like he is supposed to be under this unwritten code that the criminal gang adheres to, then he shows weakness on his part.

With these purposes for the expert's testimony in mind, we now turn to Defendant's arguments on appeal.

## B.    THE EXPERT WAS QUALIFIED

**{15}** Under Rule 11-702 NMRA, "a witness must qualify as an expert in the field for which his or her testimony is offered before such testimony is admissible." *State v. Downey*, 2008-NMSC-061, ¶ 26, 145 N.M. 232, 195 P.3d 1244 (internal quotation marks and citation omitted). Rule 11-702 permits a witness to be qualified based on his or her knowledge, skill, experience, training, or education, "but no set criteria can be laid down to test such qualifications." *Id.* (internal quotation marks and citation omitted). We have emphasized the use of the disjunctive "or" in Rule 11-702 in recognizing the wide discretion given the trial court in qualifying experts to testify. *See, e.g.*, *State v. McDonald*, 1998-NMSC-034, ¶ 20, 126 N.M. 44, 966 P.2d 752.

**{16}** The trial court qualified Detective Martinez to testify as an expert witness with

5

respect to gang-related law enforcement and gang culture on the basis of his knowledge, skill, and experience in those fields. Defendant argues that Detective Martinez was not qualified to be an expert on these subjects because he (1) did not have personal knowledge of Taos area gangs; (2) did not have a college degree; (3) had not previously testified as an expert before a jury; (4) had never worked undercover in a gang unit; (5) had not published any materials that were subject to peer review; and (6) could not point to any recognized field of study that sought to determine why gang members assault one another. Defendant also argues that Detective Martinez was not qualified to predict the human behavior of gang members. The State contends that Detective Martinez was qualified to give expert testimony on gang culture and gang-related law enforcement because, among his other qualifications, he had thirteen years' experience as a police officer working with gang units, had spent approximately 2,000 hours instructing other law enforcement personnel about gang culture and investigation, and had written the Albuquerque, Bernalillo County Street Gang Manual.

**{17}** In addition to the expert's qualifications upon which the State relies, the record reflects that Detective Martinez also possessed the following qualifications at the time of Defendant's trial. As an investigating officer with the Bernalillo County Sheriff Department's gang unit, it was his responsibility to certify gangs as criminal, identify members of those gangs, and collect intelligence on and conduct investigations of those gangs and individuals. He had been certified by the New Mexico Gang Task Force and the Bernalillo County Sheriff's Department, as well as a private entity that certifies police officers who have completed its gang specialization course. His specialist certification was valid with the FBI and the federal Bureau of Alcohol, Tobacco, Firearms and Explosives. In addition to authoring the Albuquerque, Bernalillo County Street Gang Manual, he had also authored training programs on gang-related law enforcement and was certified as an instructor with the New Mexico Law Enforcement Training Academy. Finally, through his work, he had become familiar with Taos area gangs.

**{18}** Based on these qualifications, we cannot say that the trial court abused its discretion in qualifying Detective Martinez as an expert on gang-related law enforcement and gang culture. Rule 11-702 expressly allows experts to be qualified based on their skills and experience, and Detective Martinez's experience with gangs was sufficient to allow his testimony on this subject. That Detective Martinez did not have a college degree, had not previously testified as an expert before a jury, and had never worked undercover in a gang unit does not nullify the trial court's determination that his experience in working with criminal gangs in New Mexico was sufficient for him to testify as an expert on gang culture and the behaviors of gang members. Furthermore, we note that the jury was free to weigh every aspect of Detective Martinez's qualifications in their evaluation of his testimony, and any perceived deficiencies in his qualifications were "relevant to the weight accorded by the jury to [the] testimony and not to the testimony's admissibility." *McDonald*, 1998-NMSC-034, ¶ 21 (internal quotation marks and citation omitted). Therefore, the trial court did not err in qualifying Detective Martinez as an expert.

## C.   THE EXPERT'S TESTIMONY WAS BASED ON HIS SPECIALIZED

## KNOWLEDGE

{19}     Although an expert may be qualified to give an opinion on a given subject, the expert's testimony may nevertheless be inadmissible under Rule 11-702, which requires that the testimony assist the trier of fact and be based on "scientific, technical or other specialized knowledge." *See Alberico*, 116 N.M. at 166, 861 P.2d at 202 ("We discern three prerequisites in Rule [11-]702 for the admission of expert opinion testimony.  The first requirement is that the expert be qualified. . . . The second consideration . . . is whether [the testimony] will assist the trier of fact. . . . The third requirement . . . is that an expert may testify only as to 'scientific, technical or other specialized knowledge.'").  We have already addressed the first of these three inquiries, whether the expert is qualified.  We do not address whether the expert's testimony assisted the trier of fact because that argument was not raised by Defendant.  In light of Defendant's remaining arguments, we now turn to whether Detective Martinez's testimony was based on his specialized knowledge.

{20}     Defendant argues that the trial court should have excluded Detective Martinez's testimony because it amounted to nothing more than "junk science" and an unscientific attempt to predict the behavior of gang members.  Defendant also argues that the reliability of Detective Martinez's methodology could not be tested because there is no recognized field of scientific study that seeks to explain in a scientific manner why gang members assault one another.  To the extent that Defendant is arguing that Detective Martinez's expert testimony should have been excluded because it is not the subject of a valid science and there are no means to test the reliability of his results, we disagree.  Defendant confuses the standards applicable to determining the admissibility of expert *scientific* testimony with those for admitting expert testimony based on the *specialized knowledge* of the expert witness.

{21}     The requirements that scientific expert testimony be "grounded in valid, objective science" and "reliable enough to prove what it purports to prove," *Alberico*, 116 N.M. at 168, 861 P.2d at 204, are inapplicable to expert testimony that is based on the expert's specialized knowledge. *See State v. Torres*, 1999-NMSC-010, ¶ 43, 127 N.M. 20, 976 P.2d 20 ("[A]pplication of the *Daubert* [*v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993)] factors is unwarranted in cases where expert testimony is based solely upon experience or training." (quoting *Compton v. Subaru of Am., Inc.*, 82 F.3d 1513, 1518 (10th Cir. 1996))); *accord United States v. Hankey*, 203 F.3d 1160, 1168-70 (9th Cir. 2000) ("The *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to [gang expert] testimony, whose reliability depends heavily on the knowledge and experience of the expert, rather than the methodology or theory behind it.").  Nevertheless, "[i]t is the duty of our courts . . . to determine initially whether expert testimony is competent under Rule 702 . . . ." *Alberico*, 116 N.M. at 164, 861 P.2d at 200.  In other words, even with non-scientific expert testimony, the trial court must exercise its gate-keeping function and ensure that the expert's testimony is reliable.  However, when testing the reliability of non-scientific expert testimony, rather than testing an expert's scientific methodology as required under *Daubert* and *Alberico*, the court must evaluate a non-scientific expert's personal knowledge and experience to determine whether the expert's conclusions on a

7

given subject may be trusted.  *See Hankey*, 203 F.3d at 1168-69.

**{22}**     While this inquiry is similar to a determination of whether an expert is qualified to opine on a given subject, the two inquiries are not identical.  The first inquiry, testing an expert's qualifications, requires that the trial court determine whether an expert's skills, experience, training, or education qualify him or her in the relevant subject.  Although the second inquiry uses these same factors, the court uses them to test the validity of the expert's conclusions.  In this way, an expert may be qualified to offer opinions on a subject, but those opinions may nevertheless be unreliable in that they do not prove what they purport to prove.  We need not repeat Detective Martinez's qualifications here.  We have already concluded that the trial court did not err in qualifying him as an expert on the subject of "gang-related law enforcement and gang culture."   However, our inquiry does not stop with a determination of his specialized knowledge on these subjects.  We must also determine whether his knowledge of gangs generally permitted him to offer an expert opinion regarding the motives of individual gang members.

**{23}**     It is widely held that expert opinion testimony is admissible to prove motive or intent of a gang member, subject to the balancing requirements of Rule 11-403 NMRA.  *See State v. Torres*, 874 A.2d 1084, 1093-95 (N.J. 2005) (listing cases admitting expert testimony on gang issues to prove the defendant's motive).  Indeed, this Court has held that Rule 11-404(B) NMRA permits an expert to testify regarding a defendant's affiliation with a gang, as well as gang-specific rituals and procedures, "to show Defendant's alleged motive (to rise up in the ranks of the gang by performing a hit on its behalf) and intent to murder the victims."  *State v. Nieto*, 2000-NMSC-031, ¶ 25, 129 N.M. 688, 12 P.3d 442.   Here, Detective Martinez testified from his personal experience with gangs that gang members retaliate in violent ways when disrespected.  He testified that being disrespected can occur in any number of ways, some of which could have been applicable in Defendant's situation if sufficient evidence of Defendant's gang affiliation had been presented to the jury.  Based on his experience and knowledge, the trial court did not err in concluding that Detective Martinez's opinions were reliable and that his testimony regarding the motives of gang members proved what it was offered to prove.

**{24}**     Despite the admissibility of evidence of a defendant's "other crimes, wrongs or acts" to prove his or her motive or intent under Rule 11-404(B), Defendant encourages us to conclude that the expert's testimony was impermissible propensity evidence that was offered to show his conformity with the criminal actions of gang members in general and of BST members in particular.  "To be sure, evidence of gang affiliation could be used improperly as a backdoor means of introducing character evidence by associating the defendant with the gang and describing the gang's bad acts."  *Nieto*, 2000-NMSC-031, ¶ 25.  However, Rule 11-404(B) specifically allows evidence of "other crimes, wrongs or acts" to prove "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident."  Defendant does not dispute that the expert's testimony was offered to rebut his claim of self-defense, and therefore went to his motive for shooting at the house.  In fact, Defendant acknowledged at trial that "the only battleground here is [Defendant's] intent."

Given Defendant's admission at trial that he fired a high-powered rifle that could have killed Danica, we agree that the primary issue the jury needed to resolve was his motive for doing so. Therefore, like the defendant in *Nieto*, the expert's testimony was not impermissible propensity evidence because it was offered to establish Defendant's motive.

{25} Defendant attempts to distinguish *Nieto* on the basis that the expert in *Nieto* was allowed to testify only regarding the defendant's affiliation with a particular gang and that gang's specific rituals, procedures, clothing, and symbolism. *See id.* ¶ 25 (stating that the expert testified regarding the defendant's "affiliation with the 18th Street Gang and the specific rituals and procedures of that gang"). We understand Defendant to be arguing that Detective Martinez's expert testimony should have been excluded as impermissible character evidence under Rule 11-404 because he did not base his testimony on the specific behaviors and rituals of BST, the gang to which Defendant allegedly belonged at the time of the shooting. We agree with Defendant that Detective Martinez's testimony should have been grounded in facts specific to Defendant's case and that he effectively concluded that Defendant was motivated by the code of conduct of street gangs without sufficient additional evidence that any of the key players were gang members or that the shooting was in any way gang-related. However, rather than distinguishing *Nieto* on Rule 11-404 grounds, we believe our analysis is better suited to balancing the testimony's probative value against the danger of unfair prejudice to Defendant under Rule 11-403.

## D.     THE EXPERT'S TESTIMONY WAS UNFAIRLY PREJUDICIAL

{26} Although gang expert testimony may be allowable to prove motive under Rule 11-404(B), it must still satisfy the requirements of Rule 11-403, which mandates exclusion "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues or misleading the jury, or by considerations of undue delay, waste of time or needless presentation of cumulative evidence." *See Nieto*, 2000-NMSC-031, ¶ 26 (subjecting gang expert's testimony admitted to prove motive to Rule 11-403 balancing). Here, the probative value of Detective Martinez's testimony was outweighed by the danger of unfair prejudice because there was no evidence presented at trial that Defendant was a gang member at the time of the shooting, the party was a "gang party," or the shooting was in any way gang-related.

{27} "[T]he allegation that a defendant is in a gang ought not serve as a justification for extensive expert testimony regarding criminal gangs." *State v. DeShay*, 669 N.W.2d 878, 887 (Minn. 2003); *see also Utz v. Commonwealth*, 505 S.E.2d 380, 385 (Va. Ct. App. 1998) (recognizing that "evidence identifying a defendant as a member of a gang may be prejudicial, since juries may associate such groups with criminal activity and improperly convict on the basis of inferences as to the defendant's character" (citation omitted)). Thus, "[t]he district court should scrutinize proffered gang expert testimony, preferably outside the presence of the jury, and exclude it where irrelevant, confusing, or otherwise unhelpful." *DeShay*, 669 N.W.2d at 888 (internal quotation marks and citation omitted). Gang expert testimony "must be carefully monitored by the court so that the testimony will not unduly

influence the jury or dissuade it from exercising its independent judgment." *Id.*

**{28}**     Here, the probative value of Detective Martinez's testimony would have been significant if the State had offered other evidence that the shooting was gang-related.  The purpose of the expert's testimony was to prove that Defendant returned to the party with the intention of shooting at the house in retribution for having been disrespected.  However, the probative value of this testimony was contingent upon the State offering additional evidence that Defendant was in fact a gang member at the time of the shooting or that the shooting was somehow related to gang rituals, rivalries, procedures, or other aspects of gang culture.  Absent corroborative evidence that the incident was influenced by a gang's code of conduct or other criminal aspects of gang culture, the risk that Defendant was convicted because he was, or at one time had been, a member of a gang is too great to allow the evidence to be put before the jury.  *See State v. Cox*, 908 P.2d 603, 609 (Kan. 1995) ("Gang evidence is only admissible where there is sufficient proof that membership or activity is related to the crime charged.").

**{29}**     At Defendant's trial, there was no evidence presented supporting the State's theory that Defendant was a member of BST or any other gang at the time of the shooting. Evidence was presented that on the night of the shooting, Defendant admitted to having been in BST *at one time*, an admission he confirmed with his testimony.  The State also presented evidence of Defendant's BST tattoo.  However, the State never connected that tattoo with his continued membership in BST, and the State did not present any evidence that Defendant was a member of another gang at the time of the shooting.  Thus, even considering Detective Martinez's testimony, the State produced no evidence of Defendant's gang membership at the time he shot at the house.

**{30}**     In addition, the State produced no evidence that the Halloween party was a "gang party," such that the shooting was somehow connected to gang rivalry or other gang rituals or procedures.  Indeed, testimony was presented that while members of one or more unidentified gangs were at the party, it was not a "gang party."  Testimony was also given that the shooting itself was not gang-related.  Furthermore, the men who threatened and shot at Defendant and his companions were not identified, and their membership in any gang was unknown.  Similarly, the party's hosts were never identified as members of BST or any other gang.  Finally, the State's expert did not testify that the shooting itself was related to gang rivalry or other gang rituals.

**{31}**     Because no evidence was presented that Defendant was a member of any gang at the time of the shooting, the party was a "gang party," or the shooting was gang-related, Detective Martinez's testimony regarding Defendant's motive was largely, if not entirely, irrelevant.  *See, e.g.*, *Cox*, 908 P.2d at 611 (holding that because "[n]o evidence was introduced . . . to suggest that the motive for the killing was gang related . . .[,] the trial court abused its discretion by admitting the gang expert testimony").  While Detective Martinez's testimony was relevant to show that Defendant was a member of BST, his testimony regarding Defendant's motive was irrelevant because the State offered no evidence that

Defendant was a gang member at the time of the shooting. In the absence of supporting evidence, the expert's testimony unfairly prejudiced Defendant by asking the jury to find that Defendant was a member of a gang and to conclude that he acted in accordance with the gang's code of conduct.

{32} Evidence of a defendant's gang affiliation "is likely to be damaging to a defendant in the eyes of the jury" because "[g]angs generally arouse negative connotations and often invoke images of criminal activity and deviant behavior." *United States v. Irvin*, 87 F.3d 860, 864, 865 (7th Cir. 1996) (internal quotation marks and citation omitted). "There is therefore always the possibility that a jury will attach a propensity for committing crimes to defendants who are affiliated with gangs or that a jury's negative feelings toward gangs will influence its verdict." *Id.* at 865. In Defendant's case, we are especially wary of the threat of guilt by association because Defendant's intent was the primary issue to be resolved at trial. *See State v. Phillips*, 2000-NMCA-028, ¶ 29, 128 N.M. 777, 999 P.2d 421 ("[A] real threat of guilt by association may exist where the defendant's gang membership is the entire theme of the trial." (internal quotation marks and citation omitted)). As a result, we conclude that the trial court abused its discretion in admitting Detective Martinez's expert testimony on gang culture and gang-related law enforcement. *See State v. Chamberlain*, 112 N.M. 723, 726, 819 P.2d 673, 676 (1991) ("[I]n applying Rule [11-]403, . . . [e]vidence should be excluded if it is calculated to arouse the prejudices and passions of the jury and [is] not reasonably relevant to the issues of the case." (internal quotation marks and citation omitted)).

## E.    THE EXPERT'S TESTIMONY WAS NOT HARMLESS

{33} Having concluded that the trial court erred in admitting Detective Martinez's testimony, we must now determine if that error was harmless. *See, e.g.*, *Casaus v. State*, 94 N.M. 58, 59, 607 P.2d 596, 597 (1980) (concluding that evidence admitted improperly under the predecessor to Rule 11-403 was not harmless error). To determine whether a non-constitutional error was harmless, we must assess whether there is no reasonable probability that the error affected the verdict. *State v. Barr*, No. 30,191, slip op. at ¶ 54 (N.M. Sup. Ct. May 22, 2009). In this case, we have no doubt that there is a reasonable probability that the expert's testimony contributed to Defendant's conviction. The expert testified that Defendant was a member of the BST criminal street gang, that the events of the night of the shooting were such that any gang member in Defendant's shoes would have been disrespected, and that gang members always retaliate against those who disrespect them with violence. Because Defendant's motive for shooting at the house was the primary issue before the jury and the expert's testimony was the linchpin in the State's evidence rebutting Defendant's claim of self-defense, the error of admitting Detective Martinez's testimony was not harmless.

## III.   CONCLUSION

11

**{34}** For the reasons stated above, we hold that the trial court erred in admitting Detective Martinez's expert testimony on gang culture and gang-related law enforcement. We therefore vacate Defendant's convictions for first degree murder, shooting at a dwelling resulting in injury, and tampering with evidence, and remand to the district court for a new trial.

**{35}  IT IS SO ORDERED.**

_____
**EDWARD L. CHÁVEZ, Chief Justice**

**WE CONCUR:**

_____
**PATRICIO M. SERNA, Justice**

_____
**PETRA JIMENEZ MAES, Justice**

_____
**RICHARD C. BOSSON, Justice**

_____
**CHARLES W. DANIELS, Justice**

**Topic Index for _State v. Orlando Torrez_, No. 29,869**

| | |
|---|---|
| **AE** | **APPEAL AND ERROR** |
| AE-HE | Harmless Error |
| **CL** | **CRIMINAL LAW** |
| CL-HO | Homicide |
| CL-SD | Self-defense |
| **CA** | **CRIMINAL PROCEDURE** |
| CA-EX | Expert Witness |
| **EV** | **EVIDENCE** |
| EV-AE | Admissibility of Evidence |
| EV-EW | Expert Witness |

EV-ON          Opinion
EV-PJ          Prejudicial Evidence
EV-PB          Probative Value vs. Prejudicial Effect
EV-RC          Relevancy, Materiality, and Competency
EV-SC          Scientific Evidence & *Daubert* Standard