# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

Opinion Number: _____

Filing Date: **APRIL 21, 2016**

**NO. 33,836**

**SAMANTHA MIKESKA,**

Plaintiff-Appellant,

v.

**LAS CRUCES REGIONAL MEDICAL CENTER, LLC d/b/a MOUNTAIN VIEW REGIONAL MEDICAL CENTER,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF DOÑA ANA COUNTY**
**Douglas R. Driggers, District Judge**

The Pickett Law Firm
Mark L. Pickett
Las Cruces, NM

for Appellant

Madison & Mroz, P.A.
Ada B. Priest
M. Eliza Stewart
Rebecca S. Kenny
Albuquerque, NM

for Appellee

**OPINION**

**ZAMORA, Judge.**

{1}     Plaintiff Samantha Mikeska (Plaintiff) appeals a judgment entered in favor of Las Cruces Regional Medical Center, d/b/a Mountain View Medical Center (Defendant) after a jury trial on Plaintiff's claim under the Emergency Medical Treatment and Active Labor Act, 42 U.S.C. § 1395dd (2011) (EMTALA). Plaintiff argues that the district court erred in allowing expert witness testimony concerning the purpose and scope of the EMTALA, and the corresponding jury instructions. Plaintiff also argues that the district court erred in instructing the jury to disregard certain evidence, particularly evidence that Plaintiff was misdiagnosed. We hold that the district court erred in allowing an expert witness to testify concerning questions of law. We further hold that the district court erred in allowing testimony and giving instructions that misstated the law and interjected a false issue into the trial. Last, we hold that the district court erred in instructing the jury to disregard evidence that Plaintiff was misdiagnosed. We reverse and remand.

**I.     FACTUAL AND PROCEDURAL BACKGROUND**

{2}     Plaintiff initially visited Defendant's emergency room twice on the same day, and was discharged on both occasions after being misdiagnosed with a ruptured ovarian cyst. Four days later she once again returned to Defendant's emergency room

at which point she was accurately diagnosed with a bowel obstruction. Emergency surgery to remove a portion of her bowel was ultimately required.

{3} Plaintiff filed suit against Defendant alleging that Defendant provided inadequate screening and inappropriately discharged her in an unstable condition after each of her first two visits to the emergency room, in violation of EMTALA. Plaintiff's EMTALA claim proceeded to trial. In anticipation of Dr. Paul Bronston's testifying on behalf of Defendant, Plaintiff filed a motion to exclude his testimony, but later withdrew it. Plaintiff subsequently filed a motion in limine to exclude as irrelevant, any evidence or argument concerning the purpose of the EMTALA. The district court heard the parties' arguments on the motion during a pre-trial hearing.

{4} At the pre-trial hearing, Plaintiff's counsel argued that the initial purpose of the EMTALA is not relevant in determining whether a violation has occurred, because under the statute all patients must be appropriately screened and discharged in a stable condition regardless of the patients' ability to pay. Defendant's counsel argued that the statute's purpose was relevant to its theory that Plaintiff did not receive disparate screening or treatment. The following exchange took place between the district court and Plaintiff's counsel:

> Court:     [T]he [c]ourt's ruling is that the statute stands for itself, and any interpretation of it, the meaning, goes to the evidence to be presented by the parties or the experts as to how they interpret the statute.

Counsel for Plaintiff: And why would the [c]ourt allow an expert to come in and interpret the law? Isn't that the position and function of the [j]udge? I've never been in a trial, ever, in which someone came in and said, [t]his is what the law is, and explained to the jury what the law is. The jury is there to answer questions.

Court: Right.

. . . .

Court: I like my ruling. All right. Next.

Counsel for Plaintiff: Judge, the fourth point is that [D]efendant[] listed two witnesses, expert witnesses, who we believe will come in and discuss [the] EMTALA and what [the] EMTALA requires[.]

Court: I thought your co-counsel said that wasn't the responsibility of the experts; it was the responsibility of the [c]ourt.

Counsel for Plaintiff: Well, I think that's true.

Court: Are you changing your tune?

Counsel for Plaintiff: No.

Ultimately, Plaintiff's motion in limine was denied. The district court informed counsel that Dr. Bronston would be allowed to testify. Defendant presented the expert testimony of Dr. Paul Bronston concerning the purpose and scope of the EMTALA.

{5} In the course of trial, Plaintiff's counsel reiterated her objection to any evidence of the patient's ability to pay or the prohibition of discrimination and questioned the relevancy of this information in an EMTALA claim. Specifically, at

3

Defendant's request and over Plaintiff's objection, the district court instructed the proposed jury, as well as the empaneled jury, on the issue of discrimination based on Plaintiff's ability to pay. The district court also instructed the jury, over Plaintiff's objection, that medical negligence was not an issue in this case, stating "[y]ou are not to concern yourselves with [evidence that Plaintiff was misdiagnosed], nor should it have any bearing on your verdict in this case." The jury found that Defendant did not violate the EMTALA in screening or treating Plaintiff during her first two visits to its emergency room. Plaintiff filed a motion for new trial contending that Dr. Bronston's testimony on the history and purpose of EMTALA regarding the ability to pay was irrelevant. She also argued that Dr. Bronston misled the jury when he testified that the emergency room doctors' medical negligence was not to be relied upon in determining an EMTALA claim. The motion was denied. This appeal followed.

**II.    DISCUSSION**

{6}    On appeal, Plaintiff argues that the district court erred in allowing Dr. Bronston to express his legal opinions to the jury about the purpose and scope of the EMTALA, and the legal significance of insurance coverage under the EMTALA. Defendant argues that Plaintiff either failed to object to Dr. Bronston's testimony or waived any objection to the evidence of payment or ability to pay, thereby failing to preserve this

4

first issue on appeal. While it may have been best practices to raise her objection again during Dr. Bronston's testimony, we find that Plaintiff properly preserved this issue on appeal and invoked a ruling by the trial court by filing her second motion in limine to exclude any evidence of the purpose of the EMTALA; objecting to Defendant's contentions in the statement of the case instruction about ability to pay; objecting to Defendant's proposed instruction on the purpose of EMTALA; and by filing a motion for new trial. *See Benz v. Town Ctr. Land, LLC*, 2013-NMCA-111, ¶ 24, 314 P.3d 688 ("To preserve an issue for review on appeal, it must appear that appellant fairly invoked a ruling of the trial court on the same grounds argued in the appellate court."(internal quotation marks and citation omitted)). Plaintiff also contends that the district court erred in instructing the jury on the elements of an EMTALA claim and by giving erroneous and misleading instructions on the significance of evidence that was admitted at trial. We discuss the purpose and scope of the EMTALA, and then each of Plaintiffs' contentions in turn.

**A.    The EMTALA**

{7}    The EMTALA was enacted to prevent hospitals from patient "dumping," that is "refusing to treat patients who do not have health insurance or are otherwise unable to pay for services." *Godwin v. Mem'l Med. Ctr.*, 2001-NMCA-033, ¶ 17, 130 N.M. 434, 25 P.3d 273. It applies to hospitals receiving federal funding from Medicare and

5

that operate an emergency care department. *See* § 1395dd(e)(2) and 42 U.S.C. § 1395cc (2015). Under the EMTALA, participating hospitals have two primary obligations. *See Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 551 (10th Cir. 2000). The hospital must first conduct a medical screening examination "to determine whether the patient is suffering from an emergency medical condition." *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 796 (10th Cir. 2001); *see* §1395dd(a). When an emergency medical condition exists, the hospital must "stabilize the patient before transporting him or her elsewhere." *Phillips*, 244 F.3d at 796; *see* §1395dd(b)(1)(A), (B). "[A t]ransfer includes [a] discharge." *See Godwin*, 2001-NMCA-033, ¶ 20 (internal quotation marks and citation omitted); *see also* § 1395dd(e)(4).

{8}    The EMTALA's private right of action permits recovery in damages where hospitals fail to comply with these obligations. *See* § 1395dd(d)(2)(A). Although the EMTALA was "originally intended to cure the evil of dumping patients who could not pay for services, the rights guaranteed under EMTALA apply equally to all individuals whether or not they are insured." *Phillips*, 244 F.3d at 796; *see Collins v. DePaul Hosp.*, 963 F.2d 303, 308 (10th Cir. 1992) (stating that the plaintiff's ability to pay did not preclude his action under the EMTALA); *see also Summers v. Baptist Med. Ctr. Arkadelphia*, 91 F.3d 1132, 1137 (8th Cir. 1996) (en banc) ("The [EMTALA] clearly applies to 'any individual,' whether insured or not, and, therefore,

the fact that [the defendant's] motivation in this particular case was obviously not to dump an uninsured or indigent patient does not defeat the plaintiff's action." (citation omitted)).

{9} The goal of the medical screening examination required by § 1395dd(a) "is to determine whether a patient with acute or severe symptoms has a life threatening or serious medical condition." *Godwin*, 2001-NMCA-033, ¶ 47 (internal quotation marks and citation omitted). "[T]he hospital must develop a screening procedure designed to identify such critical conditions that exist in symptomatic patients and to apply that screening procedure uniformly to all patients with similar complaints." *Id.* (internal quotation marks and citation omitted). In *Godwin*, this Court rejected the defendant's argument that in order to prove a § 1395dd(a) violation, a plaintiff must present evidence that the hospital treated him differently in its screening process from other patients with similar conditions. *Godwin*, 2001-NMCA-033, ¶¶ 59-60. We held that "a plaintiff's proof of the existence of a standard screening procedure for a person presenting a medical condition, and of a deviation from that standard screening procedure with respect to that person, is a prima facie showing of inappropriate screening." *Id.* ¶ 59. A plaintiff is not required to prove that he received disparate treatment. *See Gatewood v. Wash. Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C. Cir. 1991) ("[A] hospital fulfills the appropriate medical screening requirement

when it conforms in its treatment of a particular patient to its standard screening procedures." (internal quotation marks omitted)).

{10} If a hospital determines that a patient has an emergency medical condition, the hospital must provide either:

> (A) within the staff and facilities available at the hospital, for such further medical examination and such treatment as may be required to stabilize the medical condition, or

> (B) for transfer of the individual to another medical facility in accordance with subsection (c) of this section.

§ 1395dd(b)(1)(A), (B). The United States Supreme Court has held that under § 1395dd(b)(1), a plaintiff is not required to show improper motive on the part of the hospital in order to establish that the hospital failed to provide the necessary stabilizing treatment for his emergency medical condition. *See Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253-54 (1999) (per curiam) (reversing a decision by the Court of Appeals for the Sixth Circuit, which held that proof of improper motive was necessary for recovery under § 1395dd(b)'s stabilization requirement). In sum, neither proof of disparate treatment, nor proof of a hospital's improper motive is required to show a violation of § 1395dd of the EMTALA.

**B.    Bronston Testimony**

{11} Plaintiff argues that the district court erred in allowing Bronston to "misinform" the jury that the EMTALA is only about providing access to emergency

8

medical care for patients who cannot afford it, and to prevent discrimination. Plaintiff also contends that Bronston interjected a false issue by improperly referencing her health insurance coverage. "We review the admission or exclusion of evidence for abuse of discretion." *Progressive Cas. Ins. Co. v. Vigil*, 2015-NMCA-031, ¶ 13, 345 P.3d 1096 (internal quotation marks and citation omitted), *cert. granted,* 2015-NMCERT-003, 346 P.3d 1163. "An abuse of discretion will be found when the trial court's decision is clearly untenable or contrary to logic and reason." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 28, 329 P.3d 658 (internal quotation marks and citation omitted). "Such discretion . . . is a legal discretion to be exercised in conformity with the law." *Id.* (internal quotation marks and citation omitted). When a district court exercises its discretion in admitting evidence based on a misapprehension of the law, it abuses its discretion, *see State v. Jaramillo*, 2012-NMCA-029, ¶ 17, 272 P.3d 682, and our review is de novo. *See State v. Duran*, 2015-NMCA-015, ¶ 11, 343 P.3d 207.

**1.      Bronston Testimony Concerning Questions of Law Is Inadmissible**

{12}     Rule 11-702 NMRA provides that an expert witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

9

in issue." An expert witness "may give his opinion on matters pertaining to his field[,] which concern questions of fact." *Beal v. S. Union Gas Co.*, 1960-NMSC-019, ¶ 29, 66 N.M. 424, 349 P.2d 337. "Testimony of expert witnesses is, in general, confined to matters of fact, as distinguished from matters of law." *Id.* ¶ 30 (internal quotation marks and citation omitted).

{13}     In the present case, Bronston was accepted, without objection, as an expert in emergency medicine and medical quality management. The focus of his testimony was on EMTALA and the interpretive guidelines for that federal statute. He gave appropriate expert testimony interwoven with impermissible legal conclusions. Bronston testified concerning the history of the EMTALA as an anti-dumping statute. He explained that EMTALA advances fair and equal treatment for patients, and requires the hospitals' screening procedures to be the same for all patients with the same symptoms. He also discussed how medical practitioners define and apply EMTALA related terms such as "emergency medical condition" and "reasonable clinical confidence."

{14}     Bronston also testified that the purpose of the EMTALA is to prevent hospitals from denying emergency medical care to patients without health insurance. According to Bronston, the EMTALA was enacted to address access to emergency care, not to address medical malpractice or negligence because there are "other laws

and regulations that were already in place to deal with that." Bronston repeatedly asserted that the EMTALA is geared toward providing access to care and does not apply to negligence or malpractice.

{15} Bronston also testified that the EMTALA "is . . . about" access to emergency medical treatment for patients without health insurance and requires uniform screening for patients with similar symptoms, "regardless of the individual's ability to pay." He repeatedly emphasized that the EMTALA requires physicians not to screen patients differently based on whether or not they have health insurance. At one point Bronston commented, "[i]n this case, the patient had insurance anyway[]." On cross examination, Bronston admitted that the EMTALA protects "any individual" seeking emergency medical treatment and that the statute does not include any language concerning the patients' ability to pay.

{16} Concerning his involvement in the present case, Bronston testified that he was hired to determine if there had been EMTALA violations, and whether Plaintiff had access to medical care such that she could be evaluated for an emergency condition. Regarding the deviation in procedure from Plaintiff's first visit to Defendant's emergency room to her second visit, Bronston stated that it was not necessary to perform the same level of screening on the second visit. Bronston did not testify regarding Defendant's medical screening policies or procedures. Nor did Bronston

11

testify as to whether Defendant deviated from its screening policies and procedures in treating Plaintiff. In fact, Bronston was not familiar with Defendant's EMTALA policy at all. Bronston testified that there was no evidence to suggest that Plaintiff did not receive fair and equal access to medical care. Nevertheless, he concluded that there was no violation of EMTALA.

{17}    Plaintiff argues that Bronston's interpretation of the EMTALA is inaccurate and misleading to the jury. Plaintiff's argument illustrates the difficulty with allowing witnesses to testify to their own interpretation of the law. It has been long established that opinion testimony seeking to set forth a legal conclusion is inadmissible. *See Beal*, 1960-NMSC-019, ¶¶ 30, 32 ("Testimony of expert witnesses is, in general, confined to matters of fact, as distinguished from matters of law . . . [f]rom a number of given facts an expert witness may give his opinion as to what may or could have caused a certain result. For example, a medical expert may state as an opinion that a certain wound or cut could have been inflicted by a knife or by a rock, but he cannot, even as an expert, state that a certain individual or group is [or is not] responsible for what happened." (internal quotation marks and citation omitted)); *see also State v. Clifford*, 1994-NMSC-048, ¶ 20, 117 N.M. 508, 873 P.2d 254 (noting that the district court has the exclusive province and responsibility of telling the jury whether conduct is or is not legal); *Flagstar Bank, FSB v. Licha*, 2015-NMCA-086, ¶ 22, 356 P.3d

1102 (holding that an affidavit in which the affiant made legal conclusions was properly excluded); *State v. Elliott*, 2001-NMCA-108, ¶ 22, 131 N.M. 390, 37 P.3d 107 (recognizing that opinion testimony is inadmissible when it seeks to state a legal conclusion); *G & G Servs., Inc. v. Agora Syndicate, Inc.*, 2000-NMCA-003, ¶ 46, 128 N.M. 434, 993 P.2d 751 (holding that testimony concerning insurance law in general, offered by the insurer's expert witness, who was an attorney, was properly excluded because that testimony would have violated rule prohibiting opinion testimony that states legal conclusion). An expert witness permitted to testify to the meaning and application of a statute conveys what may be an erroneous legal standard to the jury and invades the court's province in determining and instructing the jury on the applicable law. *See Beal*, 1960-NMSC-019, ¶ 33 ("Whatever liberality may be allowed in calling for the opinions of experts or other witnesses, they must not usurp the province of the court . . . by drawing conclusions of law[.]" (internal quotation marks and citation omitted)). Accordingly, we conclude that the district court abused its discretion in allowing Bronston to give his expert opinion on the purpose and scope of the EMTALA.

**2.      Bronston's Testimony on the Purpose and Scope of the EMTALA Conveyed an Erroneous Legal Standard to the Jury**

{18}      Plaintiff argues that by repeatedly testifying that the purpose of the EMTALA is to provide access to care for uninsured or indigent patients, and that the EMTALA

13

is not applicable to claims of negligence or malpractice, Bronston conveyed an erroneous and irrelevant legal standard to the jury. We agree.

{19} In *Godwin*, this Court recognized that, "in regard to screening, liability must be based on more than a mere misdiagnosis." 2001-NMCA-033, ¶ 64 (internal quotation marks and citation omitted). However, we also recognized that "[a] failure to examine or test pursuant to a standard screening procedure might support a medical malpractice claim under [s]tate law and at the same time also constitute evidence [sufficient] to support a claim for failure to give an 'appropriate medical screening' under [the EMTALA]." *Id.* (internal quotation marks and citation omitted). "The spheres of medical malpractice and failure to provide an appropriate medical screening may overlap." *Id.* ¶ 66. Following the logic of *Godwin*, evidence of negligence or medical malpractice may also constitute evidence of a failure to stabilize an emergency condition, under § 1395dd(b)(1). Thus, evidence of negligence or malpractice may also be evidence of an EMTALA violation under § 1395dd(a) and (b), and such evidence cannot be entirely disregarded as irrelevant to an EMTALA claim. *See, e.g.*, *Godwin*, 2001-NMCA-033, ¶ 65 (noting that "if a hospital acts consistently with its standard screening procedures it is not liable even if those procedures are deficient under state medical malpractice law" (alteration, internal quotation marks, and citation omitted)).

14

{20} Bronston testified that the EMTALA is only applicable to patients that have been denied access to care, that negligence and medical malpractice are completely separate from EMTALA claims, and are addressed by separate statutes and regulations. Bronston's expert testimony as to his interpretation of the statute potentially confused and misled the jury about the applicable legal standard and what evidence was relevant to Plaintiff's EMTALA claim.

**3.      Bronston Improperly Raised the Issue of Plaintiff's Insurance Coverage**

{21} Plaintiff argues that Bronston improperly raised the issue of her insurance coverage. Bronston testified concerning appropriate medical screening for an emergency medical condition under the EMTALA, explaining that the determination as to whether an emergency medical condition exists is within the discretion of the physician, and that the EMTALA requires that the determination be made "in a nondiscriminatory way. In other words, not to judge it differently because people have insurance or don't have insurance." As noted earlier, Bronston then commented, "[i]n this case, the patient had insurance anyway[]."

{22} As previously discussed, in order to make a prima facie showing of inappropriate screening, the plaintiff must show "the existence of a standard screening procedure for a person presenting a medical condition, and of a deviation from that standard screening procedure with respect to that person." *Godwin*, 2001-

15

NMCA-033 ¶ 59. "The question is not whether a plaintiff has insurance, or whether he was refused screening because of lack of insurance, but, rather, whether he was afforded an appropriate medical screening examination." *Summers*, 91 F.3d at 1137 (internal quotation marks omitted). Thus, a patient's ability to pay for emergency medical care and the question of whether Mikeska did or did not have health insurance was of no consequence to her EMTALA claim. Bronston's testimony regarding patients' ability to pay and regarding Plaintiff's health insurance coverage was irrelevant to Plaintiff's EMTALA claim and interjected a false issue into the trial.

**C.    Jury Instructions**

{23}    Plaintiff challenges three of the district court's instructions to the jury. We review the district court's instructions to the jury de novo. *See Benavidez v. City of Gallup*, 2007-NMSC-026, ¶ 19, 141 N.M. 808, 161 P.3d 853 ("We review jury instructions de novo to determine whether they correctly state the law and are supported by the evidence introduced at trial." (internal quotation marks and citation omitted)). We review jury instructions to determine whether a reasonable juror would have been confused or misdirected by the instruction. *See Chamberland v. Roswell Osteopathic Clinic, Inc.*, 2001-NMCA-045, ¶¶ 15-16, 130 N.M. 532, 27 P.3d 1019.

16

**1.     Instruction 19**

{24}     Instruction 19 reads: "This is a claim of a violation of the [EMTALA], which is a federal law that prevents participating hospitals from declining treatment to patients based on an inability to pay or based upon race, gender[,] or national origin." Defendant argues that the instruction misstates the law and interjects the false issue of a patient's ability to pay into the trial. We agree.

{25}     The EMTALA is a federal law that requires a hospital emergency department to provide an appropriate medical screening examination to any individual seeking emergency medical treatment. *See* § 1395dd(a). It also requires that any individual suffering from an emergency medical condition be stabilized before being discharged or transferred from the emergency department. *See* § 1395dd(b). The initial purpose of the EMTALA, the hospitals' motivation for any improper screening, and the patients' ability to pay are not reflected in the language of the statute and as we previously discussed, are not relevant to the determination of whether an EMTALA violation has occurred. Therefore, an instruction to the jury that the function of the EMTALA is to prevent the denial of care based on the ability to pay, among other things, is neither justified by evidence nor by theory and led to "the interjection of a false issue into the trial." *See Torres v. El Paso Elec. Co.*, 1999-NMSC-029, ¶ 22, 127 N.M. 729, 987 P.2d 386 (internal quotation marks and citation omitted), *overruled*

17

*on other grounds by Herrera v. Quality Pontiac*, 2003-NMSC-018, 134 N.M. 43, 73 P.3d 181; *Archibeque v. Homrich*, 1975-NMSC-066, ¶ 9, 88 N.M. 527, 543 P.2d 820 ("We have held that it is error to instruct on issues which are unsupported by the evidence or which present a false issue."); *State ex rel. State Highway Comm'n v. Atchison, Topeka & Santa Fe Ry. Co.*, 1966-NMSC-146, ¶ 4, 76 N.M. 587, 417 P.2d 68 ("It is well established that it is error to instruct on a proposition of law not supported by the evidence, or which presents a false issue."). We conclude that Instruction 19 misstates the law and is not relevant to the determination of whether an EMTALA violation occurred. Accordingly, we conclude that its usefulness is outweighed by its potential to confuse and misdirect the jury. *See Chamberland*, 2001-NMCA-045, ¶¶ 15-16.

**2.      Instructions 21 and 22**

{26}      Plaintiff contends that Instructions 21 and 22 served to mislead the jury about which evidence they could consider in determining whether an EMTALA violation occurred. Instruction 21 states:

> This case is related solely to [P]laintiff's claims of EMTALA violations. The medical negligence case against the physicians was a separate case that was decided by another jury. This is not a medical malpractice action or a claim for medical negligence against the physicians. Defendant . . ., denies *these claims* and contends that [Plaintiff] was appropriately screened under EMTALA on December 28, 2006[,] and treated by emergency department physicians who did not diagnose an

18

emergency medical condition and thereafter appropriately discharged [Plaintiff] home in a stable condition. (Emphasis added.)

{27} The first part of Instruction 21 appropriately instructs the jury that their attention should be directed at whether there were violations of EMTALA, not whether there was medical malpractice or medical negligence. However, our concern lies with the indistinct denial of "these claims." This ambiguity not only opens the door for potentially conflicting considerations, but also sends conflicting messages to the jury.

{28} Throughout the trial, the jury was discouraged from considering evidence of medical negligence. Prior to jury selection, over Plaintiff's objection, the jury panel was instructed that "this is not a medical negligence case against the physicians[, t]he medical negligence case against the physicians was a separate case that was decided by a different jury[, and t]he sole issue for [the] jury to decide in this case is whether the hospital is in violation of the [EMTALA]." Bronston was permitted to testify numerous times that the EMTALA is not applicable to medical negligence or medical malpractice.

{29} As previously discussed, evidence of medical negligence or medical malpractice may overlap with evidence of inappropriate screening or failure to stabilize an emergency medical condition under § 1395dd(a) and (b). However, the distinction between evidence of negligence or malpractice and evidence of EMTALA

19

violations was misstated and overemphasized throughout the trial, creating the potential for the jury to be confused and misled concerning the evidence that they could properly consider.

{30}     Instruction 22 is also misleading and misdirects the jury. It states:

> You have heard evidence that [Plaintiff] was misdiagnosed[.] You are not to concern yourselves with this information nor should it have any bearing on your verdict in this case. If [Plaintiff] was appropriately screened but misdiagnosed in the context of an [EMTALA] claim, it does not mean a violation occurred.

Beginning with the second sentence, the instruction is in direct conflict with *Godwin*. *See Godwin*, 2001-NMCA-033, ¶ 64 ("[F]ailure to examine or test pursuant to a standard screening procedure might support a medical malpractice claim under [s]tate law and at the same time also constitute evidence of differential treatment sufficient to support a claim for failure to give an appropriate medical screening under the [EMTALA]." (alteration, internal quotation marks, and citation omitted)). The jury is allowed to consider evidence of the misdiagnosis, but only to the extent, if any, that it applies to the issues of whether Plaintiff received the appropriate medical screening examination, or whether Defendant failed to stabilize Plaintiff before her discharge.

{31}     We conclude that Instruction 21 with Instruction 22 should not have been given. *See Atchison, Topeka & Santa Fe Ry. Co.*, 1966-NMSC-146, ¶ 6 ("Instructions[,] which are repetitious[,] or which unduly emphasize certain portions

20

of the case should not be given."); *see also Dunleavy v. Miller*, 1993-NMSC-059, ¶ 22, 116 N.M. 353, 862 P.2d 1212 (holding that an instruction that was "unnecessary and potentially confusing and serves to overemphasize one portion of the case" was improperly given).

## III. CONCLUSION

{32} In conclusion, we hold that the district court erred in allowing an expert witness to testify concerning questions of law. We further hold that the district court erred in allowing testimony and instructing the jury concerning the EMTALA's initial purpose and patients' ability to pay, and by allowing testimony and instructing the jury to disregard evidence of medical malpractice or medical negligence on Plaintiff's misdiagnosis. For these reasons, we reverse and remand for further proceedings.

{33} **IT IS SO ORDERED.**

_____
**M. MONICA ZAMORA, Judge**

**WE CONCUR:**

_____
**MICHAEL E. VIGIL, Chief Judge**

_____
**J. MILES HANISEE, Judge**